IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION


FRANK PACOSA,                               09-CV-1137-BR

        Plaintiff,                      OPINION AND ORDER

v.

KAISER FOUNDATION HEALTH PLAN
OF THE NORTHWEST,

        Defendant.


GEORGE P. FISHER
3635 S.W. Dosch Road
Portland, OR 97239
(503) 224-7730

        Attorney for Plaintiff

CHRIS KITCHEL
RYAN S. GIBSON
Stoel Rives LLP
900 S.W. 5th Avenue
Suite 2600
Portland, OR 97204
(503) 294-9429

        Attorneys for Defendant


1 - OPINION AND ORDER

**BROWN, Judge.**

This matter comes before the Court on Defendant Kaiser Foundation Health Plan of the Northwest's Motion (#14) for Summary Judgment.  For the reasons that follow, the Court **GRANTS** Defendant's Motion.


## BACKGROUND

The following facts are undisputed unless otherwise noted:

Plaintiff Frank Pacosa was hired by Defendant in 1978.  At the time of his termination in 2008, he was working for Defendant as a pediatric physician assistant (PA).

Plaintiff alleges his wife, Lizabeth, has suffered clinical depression for 16 years.  Plaintiff testifies in his Declaration that he took intermittent leave pursuant to the Family Medical Leave Act, 29 U.S.C. § 2601, *et seq.*, from 2001 through 2008 to transport his wife to various doctors' appointments.

Defendant has a secure medical-records system officially called HealthConnect.[1]  Defendant's employees who are authorized users of HealthConnect may access that system through a secure log-in account and may access particular patient's records through the system by entering the patient's health record number.  Defendant's employees and their families, including

---

[1] Defendant's employees sometimes also refer to the system as Epicare or Epic.

2 - OPINION AND ORDER

Plaintiff and his family, are often members and patients of Defendant's health plan.

Defendant maintains a number of policies limiting employees' access to medical records through HealthConnect in order to protect patient privacy and to comply with the Health Insurance Portability and Accountability Act (HIPPA), 29 U.S.C. § 1181, *et seq.*, and other laws relating to protected health information (PHI). Pursuant to its policies, Defendant's employees may not access their own records or the records of their families or friends in HealthConnect unless they are the assigned health-care provider or they have the patient's authorization and access has been approved through the proper procedure.

On January 19, 2001, Plaintiff signed a Confidentiality Statement that provided in pertinent part:

> The confidentiality of Information policy of this
> organization prohibits any unauthorized accessing
> (reading, reviewing) . . . patient . . .
> information (medical or otherwise) except as
> required to fulfill Kaiser Permanente job
> responsibilities and in accordance with Kaiser
> Permanente policies.
>
> Individuals are expressly prohibited from
> accessing the medical records (electronic or hard
> copy) of family members, friends, co-workers or
> their own without signed authorization that is in
> compliance with the Release of Information
> policies found in Medical Records Reference,
> Volume I.
>
> * * *
>
> I have read the Organizational policy regarding
> Confidentiality of Information.  I understand that

3 - OPINION AND ORDER

> any violation of the policy will result in
> immediate disciplinary action, up to and including
> termination.

Supplemental Decl. of Ryan Gibson, Ex. 2 at 16.

Plaintiff served on Defendant's Confidentiality Committee,

Defendant's confidentiality "policy-making body," from

approximately 1995 through 2002 or 2003.  Gibson Supplemental

Decl., Ex. 2 at 6.

On August 22, 2005, Plaintiff signed a Confidentiality

Statement that provided in pertinent part:

> No employee, volunteer, student, or intern should
> have access to or has the right to review or
> disclose protected health information, except when
> necessary in the regular course of performing
> one's specific job responsibilities.
>
> All protected heath information accessed, used or
> disclosed will be the minimum amount necessary to
> perform one's specific job responsibilities.
>
> Employee, volunteers, students and interns may not
> access the medical records (electronic or hard
> copy) of family members, friends, co-workers or
> their own without signed authorization and in
> compliance with the release of information polices
> found in Heath Records Reference Manual, Volume I.
>
> * * *
>
> Any violation of this policy will result in
> immediate disciplinary action, up to and including
> discharge.

Gibson Supplemental Decl., Ex. 2 at 17.

From at least January 2007 through October 2008, Plaintiff's

weekly work schedule included 20 minutes of FMLA leave every

morning to get his daughter ready for school, a full day of

4 - OPINION AND ORDER

administrative leave every Tuesday for committee meetings, four hours of FMLA leave Wednesday afternoon to take his daughter to orthodontist or speech-therapy appointments, and a vacation or personal day every Thursday.

Plaintiff alleges his daughter became severely depressed and began to receive counseling at some point in 2007.

On June 29, 2007, Plaintiff signed a Confidentiality Agreement that provided in pertinent part:

> Kaiser Foundation Health Plan of the Northwest and Kaiser Foundation Hospitals (Kaiser Permanente) have a legal and ethical responsibility to protect the privacy and security of patients, members, employees, dentists, and physicians. Kaiser Permanente also has a responsibility to ensure the security of its proprietary business information.
>
> Employees, consultants, contractors, agency personnel, volunteers, students, and other associates of Kaiser Permanente must follow all applicable laws, regulations, rules, guidelines, policies and procedures. They must not misuse Kaiser Permanente information. Kaiser Permanente information includes medical and  employee information.
>
> * * *
>
> • I will not retrieve, review, discuss, copy, or use information not related to my work, I will not disclose information to unauthorized persons who are not part of the patient's health care team, the patient's family or friends, or persons who do not have a legitimate need to know.
>
> • I understand that I should not access any protected health information except records related to my job. I will access records

5 – OPINION AND ORDER

> only when I need information to do my job.  I
> agree to follow the policies and procedures
> of Kaiser Permanente to access records.

Gibson Supplemental Decl., Ex. 2 at 18.

Plaintiff testifies in his Declaration that at some point in 2007 he "refused to enter" his wife's medical record through HealthConnect after his "then supervisor, Edith Lasfetto, said [he] could be fired for that" because he was never the health-care provider of record for his wife.  Decl. of Frank Pacosa at ¶ 7.

In mid-2007 Kimerie Larmanger became Plaintiff's supervisor.

On February 6, 2008, Lizabeth Pacosa signed an Authorization and Method to Share Protected Health Information that provided in pertinent part:

> I authorize Kaiser Permanente to discuss/share
> protected health information about me with the
> following individual(s) who are involved in my
> care.
>
> * * *
>
> I authorize information to be disclosed as
> specified below, to myself or other as indicated
> below:
> ○   Non-urgent communications (check
>      preference):  ☐ Letter ☐ Phone
>      ☐ Secure E-mail    ☐ Fax
>
> * * *
>
> ○   Verbally in person or phone
>
> To the following family member(s) or other
> person(s):  Frank Pacosa
>
> * * *

☐ _Any_ information about the patient's treatment.

Sherlock Decl., Ex. 12 at 1 (emphasis in original). Lizabeth Pacosa checked the boxes allowing for noncurrent communications with Plaintiff by "letter, phone, secure email, fax," and the box allowing communication with Plaintiff "verbally in person or phone."

On June 13, 2008, Plaintiff signed a Confidentiality Agreement that contained the same pertinent provisions as the 2007 Confidentiality Agreement.

On August 8, 2008, Larmanger spoke to Plaintiff about making changes in his schedule to better accommodate his need for leave and Kaiser's need for consistent staffing for pediatric patients' appointments. Plaintiff alleges he objected to any scheduling modifications because he might have to change his FMLA leave days and times in the future and Larmanger's proposed schedule changes could adversely "affect[] [his] family's care." Pacosa Decl. at ¶20.

Later on August 8, 2008, Larmanger sent Plaintiff an email in which she noted her conversation with Plaintiff and reiterated she wanted to modify his schedule beginning September 8, 2008, to "provid[e] flat staffing Monday-Friday for the Pediatrics Department." Larmanger advised Plaintiff that "[a] small group met about two weeks ago and many MD's [_sic_] and AC's [_sic_] in the

7 - OPINION AND ORDER

whole clinic adjusted their days due to operational need."
Pacosa Decl., Ex. 5 at 1.  Larmanger stated, "I know it will also
be great for you since Wednesday PM's [*sic*] is time the last
several years you have been needing due to being a better fit for
your schedule and family issues and better for our clinic needs."
*Id*.  Larmanger noted she "would be happy" to meet with Plaintiff
and his union representative about the proposed schedule change.
*Id*.  Plaintiff went on a planned vacation the day after this
discussion.

On August 18, 2008, Plaintiff sent Larmanger an email in
which he requested that she not change his scheduled days off
beginning September 8, 2008, because he had set "medical
appointments on [his] regularly scheduled day off that take a
month to change.  Your unilateral change will prevent me from my
scheduled appointments and will delay my care."  Pacosa Decl.,
Ex. 6.  He also informed Larmanger that the change in schedule
would not "help [his] FMLA time off because many of the FMLA
appointment [*sic*] are changing as of September."  *Id*.

On August 20, 2008, Tom Bernard, a union representative,
sent an email to Larmanger and others demanding that she cease
and desist "implementing any unilateral schedule changes in
respect to Frank Pacosa until there has been a meeting to discuss
this issue with the Union."  Decl. of George Fisher, Ex. 3.

On August 28, 2008, an administrative coordinator for PAs at

Kaiser sent an email to Plaintiff and other PAs in which he informed them in pertinent part:

> In the last two weeks I have become aware of a communication failure regarding a KPNW policy which could potentially cause severe problems for some KPNW clinicians.  KPNW has a policy that strictly prohibits employees from looking into their own medical record for any reasons.  Doing so can be grounds for termination.  I think that many clinicians believe that it is OK to look into their own medical record, as apparently it is for physicians in NWP.  I have discussed this with many PAs and NPs and most have thought it was OK to check into their own chart for lab results, radiology report, etc. and have been surprised (as I was) to learn that is forbidden.
>
> Please do not get into your own medical record for any reason.

Gibson Decl., Ex. 1 at 139.  Plaintiff testified in his deposition that he "certainly knew" after August 28, 2008, that it would be grounds for terminating him if he accessed even his own medical record.  Gibson Decl., Ex. 1 at 35.

On September 4, 2008, Larmanger sent an email to Justin McGowan,[2] as follows:

> Per your request here is the information regarding [Plaintiff] . . . .  There has been discussion lately regarding several concerns and adjustments regarding [Plaintiff].  The following is the current information:
>
> • Looked at schedule smoothing Monday-Friday by operation need and I talked to [Plaintiff] on 8/8/08 about a schedule change effective 9/8/08 to have Wednesday PM off but work

---

[2] McGowan is identified in the record as the supervisor of Larmanger's supervisor, but his specific title is not referenced.

every Thursday instead of every other

Thursday for operations & provide better
patient care.

- 8/20/08 Received a cease and desist of
  schedule change from Tom Bernard

- [Plaintiff] has submitted last minute on
  going requests for schedule changes on every
  Wednesday's [*sic*] from 2:50 PM-6:00 PM FMLA
  for the past several years so the adjustment
  of having Wednesday PM's [*sic*] shouldn't have
  been a concern since he wasn't seeing
  patients 2:50 PM-6:00 PM

- [Plaintiff] requested to change start time
  daily by email and [Leave of Absence] LOA to
  8:00 AM and stated, "I would also like to
  start at 8 AM stating in September since my
  daughter will be starting school then, I
  would need an FMLA [*sic*] to start at 8:20 as
  I have for my delayed clinic start in the
  past" which means he wouldn't work until 6:00
  PM but then get off work earlier which
  affects patient care.  Currently he has a
  start time of 8:45 AM-9:05 AM FMLA first
  patient 9:05 AM Monday-Friday.

- Lead MD talked with HR about [Plaintiff] and
  that it has been on going [*sic*] for several
  years affecting patient care and patients
  always being rescheduled

- As an exempt employee this FMLA time isn't to
  be taken out of ill time because he is exempt
  so it is difficult for payroll to tack even
  though it is built on his base schedule

- I have received request to cancel his
  Administrative time and change to FMLA but
  not to put back in clinic seeing patients

- [Plaintiff] consistently requests last minute
  Administrative time or FMLA which then
  creates the need to cancel patients instead
  of following the LOA guidelines of requesting
  time 8 weeks out which is affecting patient

care

- Involved in numerous administrative work
  [*sic*] which takes him away from patient care
  weekly. . .

- Received a request for time off to attend a
  30 year Service Award Banquet on June 9th,
  2008 per Melissa Reed it was a Focus Group to
  provide feedback and or suggestions on what
  could be done differently for future Service
  Award Banquets.

- Received approved FMLA from HR that states
  "Kathryn is a minor, mom ill so mom unable to
  provide care & transportation"

- FMLA is prescheduled on his base schedule
  Monday-Friday and sometimes two-three times
  per day ongoing for last 3+ years per the
  Lead MD Dr Brooks.  The updated "Attendance
  policy section 5 -Employees may also be
  required to provide proof of Illness for a
  dependant minor when the absence is three (3)
  or more occurrences in a rolling 12 month
  period a medical release form or proof of
  visit form will be accepted as valid evidence
  of a medical appointment". [*sic*]  I requested
  this proof since he needs time Monday-Friday
  to provide something weekly and he has not
  submitted the requested documents.

Fisher Decl., Ex. 4.

On September 5, 2008, Plaintiff sent an email to Ona Allen[3]

in which he noted his schedule for September had not been changed

due to the cease-and-desist letter, that he "would like to meet

about this," and that he wanted his schedule to remain as it was

in the future because he needed schedule "clarity" in order to

"make appropriate appointments for [his wife's] healthcare."

_____

[3] Allen's title is not identified in the record.

Pacosa Decl., Ex. 7 at 2.

On September 23, 2008, Sharon Cutley, a union representative, sent an email to Larmanger in which she noted there was a cease-and-desist letter in place for Plaintiff, Plaintiff's days and hours of work were subject to mandatory bargaining under Plaintiff's union contract, and Larmanger was not permitted to meet with Plaintiff to discuss his scheduling without a union representative present.  Pacosa Decl., Ex. 8. Larmanger never met with Plaintiff and his union representative, and the proposed changes to Plaintiff's schedule were never implemented.

From September 28 through October 5, 2008, Plaintiff took FMLA leave to care for his wife.

On September 29, 2008, Kaiser's Compliance Department received a call from Lizabeth Pacosa complaining that Plaintiff had accessed her medical records without her authorization and that he was using the information in her records to obtain a restraining order against her in a domestic-relations proceeding in Clackamas County Circuit Court.  Close to this time, Lizabeth Pacosa also called Jane Gilronan, Manager of the Medical Office (MMO) for Plaintiff's facility, with the same complaint.  The record also reflects Plaintiff obtained a restraining order against Lizabeth Pacosa in the Clackamas County proceeding on September 29, 2008.

12 - OPINION AND ORDER

On October 2, 2008, Lizabeth Pacosa called Kaiser's
"hotline" complaint line again alleging Plaintiff had accessed
her medical records without her permission and he had used that
information to obtain the restraining order entered September 29,
2008.  The hotline complaint was originally assigned to Mary Jo
Gardner, a Regional Compliance Manager.

All of Lizabeth Pacosa's complaints were ultimately directed
to Rebecca Sherlock, a HIPPA Compliance Manager in Defendant's
Compliance Department for investigation.  Sherlock requested an
audit of Plaintiff's recent activity in Defendant's HealthConnect
system.  According to Defendant, the initial audit revealed
Plaintiff had accessed the HealthConnect records of his wife and
daughter several times between September 19 and October 8, 2008,
even though Plaintiff was never the health-care provider of
record for his wife or his daughter.[4]

Based on the initial audit, Sherlock asked the IT department
on October 8, 2008, to run audit reports detailing access to
Lizabeth and Katie Pacosa's medical records in HealthConnect for
2007 and 2008.  According to Defendant, that audit showed
Plaintiff had accessed the medical records of his wife and

---

[4] Plaintiff alleges he did not access his wife's medical
record but instead accessed only the portion of the HealthConnect
medical-record system that allowed him to use Staff Messaging to
contact his wife's doctors.  Plaintiff concedes, however, this
area is within the secure medical-record area of HealthConnect,
and it gives the user the option to reference a patient's chart.
Plaintiff also admits he accessed his daughter's medical records.

13 - OPINION AND ORDER

daughter multiple times.  The audit report reflects in pertinent part:  "This report will provide information pertaining to Access to Electronic Patient Records and will display who accessed a specific Patient Record along with the Date that it was accessed and from which module in EpiCare."  Sherlock Decl., Ex. 2 at 1.  The audit report also reflects Plaintiff accessed his wife's patient record 34 times between January 1, 2007, and October 6, 2008, and his daughter's patient record 80 times between January 1, 2007, and October 6, 2008.

On October 15, 2008, Sherlock met with Larmanger, Gardner, and Leigh Ohlstein, Defendant's Human Resource Consultant, to discuss the results of Sherlock's investigation of Lizabeth Pacosa's complaints.  At that meeting, Sherlock stated Plaintiff accessed his wife's record "and was able to view the counter part of EPIC that showed Domestic Violence. . . .  [Plaintiff] was not the treating provider of his wife. . . .  From the report screen . . . it does show he did print something on 9/19. 9/22, 9/25 during the time of his leave."  Sherlock Decl., Ex. 4.  Sherlock also summarized Plaintiff's access to his daughter's medical record:

> There has been lots, and lots of access from [Plaintiff] into his daughters [*sic*] account.
> A)    Review screen
> B)    What in the medical record was done
> C)    Treating her like he was her provider of record for the daughter
> D)    He was able to treat her without her coming into the clinic which then would have

generated a co-pay (Loss of revenue)
    E)    Care done-Labs, medication, Documenting,
           Accessing
    F)    He did know that he wasn't authorized to be
           in the wife or daughters [*sic*] chart due to a
           Compliance Presentation he attended back on
           February 6, 2008.

*Id.*

On October 20, 2008, Sherlock met with Ohlstein, Gardner, Larmanger, and Gilronan to discuss the results of Sherlock's investigation as well as her recommendation. At that meeting, Sherlock noted, among other things:

[Plaintiff] treated his own daughter for personal reasons. [Plaintiff] would have normally paid a co-pay per Health Plan for his daughter to be seen (Loss of Revenue).

From the audit [Plaintiff] did access his wife's and daughters [*sic*] medical record while he was on leave. He should not have gone into his wifes [*sic*] medical record and he is a Pediatric provider and does not see adults in his practice. [Plaintiff] accessed, ordered, treated daughter as if he was the primary provider for his daughter.

1)    He accessed both the wife's medical record and the daughter's medical record while he was off on leave.
2)    The wife's medical record had multiple entries while he was out of the office on leave, it seems there was a personal reason why he was in the record.
3)    There was a manager that was doing an investigation from a previous concern listed in the file.
4)    Authorization was for Verbal only not written information to be accessed.
5)    Member audit was done regarding the daughter
6)    FMLA documentation that Mary Jo Gardner has copies of
7)    [Plaintiff] did his Annual Compliance Training for 2008 in September.

15 - OPINION AND ORDER

> 8)   [Plaintiff] did attend a Compliance
>       Presentation where he was handed copies of
>       Compliance policies: Sanctions by KP Against
>       Workforce Members Who Fail to Comply and
>       Minimum Necessary
> 9)   Without generating an appointment for his
>       daughter it didn't generate a co-pay so there
>       was a loss of revenue

Sherlock Decl., Ex. 5. Gardner testified at deposition that she also discussed at this meeting her conclusions related to an investigation into Plaintiff's FMLA requests that she had conducted pursuant to a request by either Sherlock or Sherlock's supervisor, Dolores Empey. Specifically, Gardner testified she informed Sherlock, Ohlstein, Larmanger, and Gilronan that she

> found . . . a lot of red flags, meaning that there
> were requests for FMLA that didn't seem appro-
> priate in terms of what FMLA would be used for.
> There were some things that appeared to be more
> managerial and human resources issues such a
> scheduling requests, but . . . although it was
> very complex, convoluted, a lot of things written,
> crossed out, written over, that sort of thing,
> that there wasn't anything that I could conclude
> that were of a fraudulent nature.

Fisher Decl., Ex. 8, at 23. At the end of the meeting, Sherlock, Gardner, Ohlstein, Larmanger, and Gilronan decided Defendant would conduct a "Discovery meeting" with Sherlock, Ohlstein, Empey, Larmanger, Plaintiff, and a union representative.

After the October 23, 2008, meeting and based on her investigation, Sherlock concluded Plaintiff used his employee HealthConnect access to access repeatedly the medical records of his wife and daughter even though he was not their health-care

16 - OPINION AND ORDER

provider and did not have any business reason for doing so.
Sherlock also noted such access was a violation of Defendant's
Confidential Records and Minimum Necessary policies in which
access alone constitutes a violation.  Sherlock concluded
Plaintiff's repeated access to his daughter's record was more
intrusive because Plaintiff also updated it, refilled his
daughter's prescriptions, and scheduled doctor's appointments for
her.

Sherlock considered Defendant's Sanctions Policy and found
Plaintiff's conduct constituted a Tier III willful and/or
intentional violation because Plaintiff acted either for personal
gain, with malicious intent, or with gross negligence.  Sherlock
reasoned Plaintiff's September 2008 access to his wife's record
appeared to have been to gain information that he intended to use
against her to obtain a restraining order.  In addition, Sherlock
concluded Plaintiff was fully aware of Defendant's confiden-
tiality policies, and, therefore, accessing the medical records
of his wife and daughter constituted at least gross negligence.
Sherlock considered various factors in Defendant's Sanctions
Policy and concluded Plaintiff's violations were severe,
frequent, and showed a pattern or practice of unauthorized use
and that Plaintiff knew or should have known about the policies
due to signing many of them, attending a training session, and
participating in the Kaiser Confidentiality Committee and Health

Information Management Committee.  Sherlock concluded termination of Plaintiff's employment was consistent with past recommendations regarding other Kaiser employees who had been terminated for less serious or one-time violations of the confidentiality policies.

Based on Sherlock's findings and recommendation, Defendant terminated Plaintiff's employment on October 30, 2008.  Plaintiff grieved his termination on the ground that he did not violate Defendant's policies when he accessed the medical record of his wife and daughter.  Defendant denied his grievance.  Plaintiff did not submit his grievance to arbitration.

On September 4, 2009, Plaintiff filed an action in this Court alleging Defendant (1) interfered with his right to take family medical leave in violation of FMLA, 29 U.S.C. § 2615(a); (2) terminated him for taking FMLA leave in violation of 29 U.S.C. § 2615(a); (3) interfered with the exercise of his leave rights under Oregon's Family Leave Act (OFLA), Or. Rev. Stat. § 659A.150, *et seq.*; (4) terminated his employment in retaliation for exercising his leave rights under OFLA; (5) terminated him based on his age in violation of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 620, *et seq.*; (6) interfered with and/or retaliated against him for "exercising his medical leave act rights" because of his age in violation of the ADEA; and (7) wrongfully "discharged [him] for exercising rights of

18 - OPINION AND ORDER

public importance related to his role as an employee" in violation of Oregon common law.

On October 4, 2010, Defendant filed a Motion for Summary Judgment as to all of Plaintiff's claims.

On December 16, 2010, the Court emailed the parties its preliminary analysis of the issues and advised the parties it would schedule oral argument if any party requested it.

At Plaintiff's request, the Court heard oral argument on Defendant's Motion for Summary Judgment on January 7, 2011.

## STANDARDS

Federal Rule of Civil Procedure 56(c) authorizes summary judgment if no genuine issue exists regarding any material fact and the moving party is entitled to judgment as a matter of law. The moving party must show the absence of an issue of material fact.  *Rivera v. Philip Morris, Inc.*, 395 F.3d 1142, 1146 (9th Cir. 2005).  In response to a properly supported motion for summary judgment, the nonmoving party must go beyond the pleadings and show there is a genuine issue of material fact for trial.  *Id.*

An issue of fact is genuine "'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002)(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

19 - OPINION AND ORDER

248 (1986)).  The court must draw all reasonable inferences in favor of the nonmoving party.  *Id.*  "Summary judgment cannot be granted where contrary inferences may be drawn from the evidence as to material issues."  *Easter v. Am. W. Fin.*, 381 F.3d 948, 957 (9th Cir. 2004)(citing *Sherman Oaks Med. Arts Ctr., Ltd. v. Carpenters Local Union No. 1936,* 680 F.2d 594, 598 (9th Cir. 1982)).

A mere disagreement about a material issue of fact, however, does not preclude summary judgment.  *Jackson v. Bank of Haw.*, 902 F.2d 1385, 1389 (9th Cir. 1990).  When the nonmoving party's claims are factually implausible, that party must "come forward with more persuasive evidence than otherwise would be necessary."  *Wong v. Regents of Univ. of Cal.*, 379 F.3d 1097 (9th Cir. 2004), *as amended by* 410 F.3d 1052, 1055 (9th Cir. 2005) (citing *Blue Ridge Ins. Co. v. Stanewich*, 142 F.3d 1145, 1149 (9th Cir. 1998)).

The substantive law governing a claim or a defense determines whether a fact is material.  *Miller v. Glenn Miller Prod., Inc.*, 454 F.3d 975, 987 (9th Cir. 2006).  If the resolution of a factual dispute would not affect the outcome of the claim, the court may grant summary judgment.  *Id.*

**DISCUSSION**

20 - OPINION AND ORDER

Defendant moves for summary judgment as to all of Plaintiff's claims on the grounds that Defendant had a legitimate, nondiscriminatory reason for terminating Plaintiff's employment; Plaintiff does not point to any evidence to establish Defendant's reason for termination was pretextual; Plaintiff cannot establish his requested leave was protected under FMLA or OFLA; and Plaintiff's wrongful-discharge claim is precluded by an adequate statutory remedy.

## I.    Plaintiff's Second and Fourth Claims

In his Second and Fourth Claims, Plaintiff alleges Defendant retaliated against him by terminating his employment because Plaintiff exercised his rights under FMLA and OFLA.

### A.    Standards

When a plaintiff alleges retaliation for exercising his rights under FMLA, the Ninth Circuit has held such a claim is properly analyzed as an interference claim pursuant to 29 U.S.C. § 2615(a).  *See Liu v. Amway Corp*, 347 F.3d 1125, 1135 (9th Cir. 2003)("[T]he statutory and regulatory language of FMLA makes clear that where an employee is subjected to negative consequences simply because he has used FMLA leave, the employer has interfered with the employee's FMLA leave rights. . . .  In contrast, where an employee is punished for *opposing* unlawful practices by the employer, the issue then becomes one of

discrimination and retaliation.")(emphasis in original).

In his Second and Fourth Claims, Plaintiff alleges Defendant subjected him to negative consequences (*i.e.*, termination) because he used FMLA leave, and, therefore, the Court must analyze Plaintiff's claims as claims for interference under § 2615(a) of FMLA.[5]  In addition, the Ninth Circuit has held the burden-shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), does not apply to interference claims under § 2615(a).  *Liu*, 347 F.3d at 1135.  When "an employee alleges that his or her FMLA leave is impermissibly considered in the decision to terminate him or her, this Circuit applies the standard set forth by the [Department of Labor (DOL)] in 29 C.F.R. § 825.220(c)."  *Id*.

Under the DOL standard, an employee may prove his claim that his employer interfered with his right to take protected leave by showing "by a preponderance of the evidence that [his] taking of FMLA-protected leave constituted a negative factor in the decision to terminate [him]."  This claim, like any ordinary statutory claim, may be proven "by using either direct or circumstantial evidence, or both."  *Bachelder v. Am. West Airlines, Inc.*, 259 F.3d 1112, 1125 (9th Cir. 2001).

---

[5] The parties agree Plaintiff's OFLA claims are subject to the same analysis as his FMLA claims pursuant to Oregon Revised Statute § 659A.186(2).  The Court's analysis of Plaintiff's FMLA claims, therefore, applies equally to Plaintiff's OFLA claims.

Ultimately,

> [t]o prevail [in a FMLA claim], an employee must
> prove, as a threshold matter, that the employer
> violated § 2615 by interfering with, restraining,
> or denying his or her exercise of FMLA rights.
> Even then, [the damages provision of FMLA,]
> § 2617, provides no relief unless the employee has
> been prejudiced by the violation.

*Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 89 (2002).

**B.    The parties' assertions in their briefs at summary judgment.**

Defendant moves for summary judgment as to Plaintiff's Second and Fourth Claims on the grounds that Defendant terminated Plaintiff for a nondiscriminatory reason – repeated violations of Defendant's confidentiality policies - and that Plaintiff cannot establish Defendant's stated nondiscriminatory reason is mere pretext.

As a preliminary matter, Defendant analyzes Plaintiff's claims under the *McDonnell Douglas* burden-shifting framework, which, as noted, the Ninth Circuit has held does not apply to interference claims under § 2615(a) of FMLA.  Defendant's burden-shifting argument, therefore, is unhelpful in analyzing Defendant's Motion as to these claims.  As noted, Plaintiff may avoid summary judgment if he shows "by a preponderance of the evidence that [his] taking of FMLA-protected leave constituted a negative factor in the decision to terminate [him]."

To support his assertion that his FMLA leave

constituted a negative factor in the decision to terminate his
employment, Plaintiff points to Larmanger's September 4, 2008,
email to McGowan detailing Plaintiff's schedule, including his
FMLA leave, and to the fact that either Sherlock or Empey asked
Gardner to review Plaintiff's FMLA leave after Lizabeth Pacosa
called with complaints about Plaintiff's impermissible access to
her medical record.

Defendant notes Plaintiff routinely used FMLA leave
every morning and at least one afternoon per week for years and
that Plaintiff does not point to any evidence in the record that
reflects Defendant denied any appropriate requests by Plaintiff
for FMLA leave.  In addition, even though Larmanger talked to
Plaintiff about changing his schedule, that change was never
implemented.  The record reflects the changes proposed by
Larmanger were part of the changes made by "many MD's [*sic*] and
AC's [*sic*] in the whole clinic adjust[ing] their days due to
operational need."  Finally, Defendant points out that Sherlock
or Empey asked Gardner to explore Plaintiff's use of FMLA leave
for "possible fraud" after Defendant received complaints from
Lizabeth Pacosa.  After Gardner reported at the October 20, 2008,
meeting that she did not find any fraud related to Plaintiff's
use of FMLA leave, however, there is not any indication in the
record that Defendant considered Plaintiff's FMLA leave in its
decision to terminate him.  Indeed, there is not any evidence in

the record that Plaintiff's FMLA leave was even discussed or considered at the discovery meeting on October 23, 2008, or that Sherlock's recommendation to terminate Plaintiff's employment was related to anything other than Plaintiff's improper access to the medical records of his wife and daughter.

Even viewing the evidence in the light most favorable to Plaintiff, the Court concludes on this record that it would be speculative at best for a factfinder to conclude that Defendant's decision to terminate Plaintiff included improper consideration of his FMLA leave.

**C.   The parties' assertions at oral argument.**

**1.   Lizabeth Pacosa's release**

At oral argument Plaintiff asserted his access to his wife's medical record did not violate Kaiser's confidentiality policies because Lizabeth Pacosa signed an Authorization and Method to Share Protected Health Information on February 6, 2008, which Plaintiff contends allowed him to access her medical records.

Defendant asserts the Authorization did not give Plaintiff the right to access Lizabeth Pacosa's medical records and, even if it did, the record reflects Plaintiff accessed Lizabeth Pacosa's medical records numerous times before the Authorization was signed.  Defendant also notes Plaintiff's

daughter did not sign an Authorization at any time allowing
Defendant to access her medical records, and Plaintiff's access
of his daughter's records was a separate and independent basis
for the decision to terminate Plaintiff.  The Court agrees.

Even if the Authorization allowed Plaintiff to
access Lizabeth Pacosa's medical records, which is doubtful, the
record reflects Plaintiff accessed the portion of the
HealthConnect system that included Lizabeth Pacosa's medical
records numerous times before February 6, 2008.  In addition, it
is undisputed that Plaintiff accessed his daughter's medical
records numerous times to make appointments, to order medication,
and to check her height and weight.

On this record, the Court finds the Authorization
signed by Lizabeth Pacosa was not sufficient to allow Plaintiff
to access Lizabeth Pacosa's medical records before February 6,
2008, nor to allow Plaintiff to access his daughter's medical
records in compliance with the requirements of Kaiser's
confidentiality policies.

**2.   Kaiser's confidentiality policies**

At oral argument Plaintiff also asserted a genuine
issue of material fact exists as to which Kaiser confidentiality
policy was operative and controlling relative to Plaintiff's
conduct.  Plaintiff relies on the affidavits of four employees or
former employees of Kaiser in which they assert they found

26 - OPINION AND ORDER

Kaiser's confidentiality policies to be confusing.

        As the Court noted at oral argument, however, Plaintiff signed at least four Confidentiality Statements which provided in one form or another that Kaiser prohibited any unauthorized "accessing of" patient information and "expressly prohibited [employees] from accessing the medical records (electronic or hard copy) of family members."  Gibson Supplemental Decl., Ex. 2 at 16.  In addition, Plaintiff testified in his Declaration that at some point in 2007 he "refused to enter" his wife's medical records through HealthConnect after his "then supervisor, Edith Lasfetto, said [he] could be fired for that" because he was never the health-care provider of record for his wife.  Pacosa Decl. at ¶ 7. Accordingly, even if other employees or former employees of Kaiser may have found Kaiser's confidentiality policies confusing, the Confidentiality Statements signed by Plaintiff were quite clear on the issue of accessing his family's medical records without authorization and Plaintiff understood those policies to mean that he could be terminated for accessing those medical records without permission.

        On this record the Court concludes Plaintiff has failed to show a legitimate issue of material fact exists that bears on his Second and Fourth Claims.  Accordingly, the Court grants Defendant's Motion for Summary Judgment against those Claims.

27 - OPINION AND ORDER

## II.  Plaintiff's First and Third Claims

Plaintiff alleges in his First and Third Claims that Defendant interfered with the administration of Plaintiff's leave rights when Larmanger attempted to change Plaintiff's work schedule and Gardner investigated Plaintiff for possible abuse of FMLA leave.[6]

Defendant contends Plaintiff cannot show that Defendant unlawfully denied or otherwise interfered with Plaintiff's family leave or that he suffered any actual prejudice as a result of any alleged denial of leave.  *See Ragsdale*, 535 U.S. at 89 ("To prevail [in a FMLA claim], an employee must prove . . . the employee has been prejudiced by the violation.").

Defendant again points out that it never implemented a change in Plaintiff's proposed schedule, and, therefore, Defendant did not affect Plaintiff's FMLA leave.  In addition, Defendant notes Plaintiff submitted 36 Leave of Absence (LOA) requests in 2008, 21 of which Plaintiff concedes were not requests for FMLA leave.  Of the remaining 15 LOA requests, most were approved by Larmanger or Gilronan.  Some of the LOA requests were initially denied by Larmanger because they were for

---

[6] As noted, the parties agree Plaintiff's OFLA claim is subject to the same analysis as his FMLA claim pursuant to Oregon Revised Statute § 659A.186(2).  The Court's analysis of Plaintiff's FMLA claim, therefore, applies equally to Plaintiff's OFLA claim.

appointments scheduled after the date on which Plaintiff's proposed schedule change would have occurred and rendered the need for extra leave unnecessary.  In any event, because Plaintiff's schedule was never changed and he was terminated in October 2008, Plaintiff has not established he was unable to attend any of the appointments for which he sought a LOA. Finally, the record reflects Defendant's denial of Plaintiff's remaining LOA requests occurred because Plaintiff sought leave for nonurgent appointments with less than the six-to-eight-week required notice period.  In fact, Plaintiff concedes he understood and was aware of Defendant's policy to deny noncurrent leave requests that were not submitted within the required period because Defendant needed advance notice to avoid patient-care disruptions.

Although Plaintiff testified at deposition that he made three or four unspecified FMLA requests initially denied and ultimately disapproved by Defendant, Plaintiff does not point to any evidence in the record to support his testimony.  Moreover, Plaintiff could not identify any medical appointment missed by his wife or daughter nor any other prejudice resulting from Defendant's alleged denials of Plaintiff's FMLA requests.

Viewing the evidence in the light most favorable to Plaintiff, the Court concludes on this record that Plaintiff has not established by a preponderance of the evidence that a genuine

issue of material fact exists as to Defendant's alleged interference with Plaintiff's FMLA leave.  Accordingly, the Court grants Defendant's Motion for Summary Judgment as to Plaintiff's First and Third Claims.

## III. Plaintiffs Fifth and Six Claims

In his Response to Defendant's Motion for Summary Judgment Plaintiff concedes Defendant's Motion as to Plaintiff's Fifth and Sixth Claims for violations of the ADEA.  The Court, therefore, grants Defendant's Motion for Summary Judgment as to these claims.

## IV.  Plaintiff's Seventh Claim

In his Seventh Claim, Plaintiff alleges Defendant "discharged [Plaintiff] for exercising rights of public importance related to his role as an employee" in violation of Oregon common law.

### A.    Standards

Under Oregon law, an employer may discharge an employee at any time for any reason unless doing so violates a contractual, statutory, or constitutional requirement.  *Patton v. J. C. Penney Co.*, 301 Or. 117, 120 (1986).  The tort of wrongful discharge is a narrow exception to this general rule.  *See Sheets v. Knight*, 308 Or. 220, 230-31 (1989).  The tort of wrongful discharge was not intended to be a tort of general application

but rather an interstitial tort to provide a remedy when the conduct in question is unacceptable and no other remedy is available. *Draper v. Astoria Sch. Dist. No. 1C*, 995 F. Supp. 1122, 1128 (D. Or. 1998)(citing *Walsh v. Consolidated Freightways, Inc.*, 278 Or. 347, 351-52 (1977)).

Oregon courts have recognized two circumstances that give rise to the common-law tort of wrongful discharge: (1) discharge for exercising a job-related right of important public interest and (2) discharge for complying with a public duty. Examples of the first category include discharge for filing a worker's compensation claim, *Brown v. Transcon Lines*, 284 Or. 597 (1978), and resisting sexual harassment by a supervisor, *Holien v. Sears, Roebuck & Co.*, 298 Or. 76 (1984). Examples of the second category include discharge for serving on jury duty, *Nees v. Hocks*, 272 Or. 210 (1975); for reporting patient abuse at a nursing home, *McQuary v. Bel Air Convalescent Home, Inc.*, 69 Or. App. 107 (1984); and for refusing to sign a false report regarding a fellow employee's work-related conduct, *Delaney v. Taco Time International Inc.*, 297 Or. 10 (1984).

**B.   Insufficient bases for Plaintiff's wrongful-discharge claim**

Plaintiff does not specify in his Complaint whether he intended to allege that he exercised rights of public importance as to Defendant's alleged age discrimination or as to Defendant's

alleged interference with his rights under the FMLA. Plaintiff
also does not address his wrongful-discharge claim in his
Response to Defendant's Motion.

To the extent Plaintiff's wrongful-discharge claim is
based on Defendant's alleged age discrimination, the Court grants
Defendant's Motion for Summary Judgment because Plaintiff has
conceded the issue of age discrimination.

To the extent Plaintiff intended to assert his claim
for wrongful discharge based on the ground that Defendant
terminated him for taking FMLA or OFLA leave, the Court concludes
this record does not support a viable claim for wrongful
discharge. Under Oregon law "a wrongful discharge claim is not
available to a plaintiff who alleges that [he] was discharged in
violation of a right in contrast to being discharged for pursuing
that right." *Dunn v. CSK Auto, Inc.*, No. CV-05-116-HU, 2006 WL
1491444, at *6 (D. Or. May 22, 2006). For example, in *Cross v.
Eastlund*, the Oregon Court of Appeals held the plaintiff, who
claimed to have been discharged because of pregnancy, did not
have a wrongful-discharge claim because she did not assert she
pursued any right, but only that she was discharged in violation
of a right. 103 Or. App. 138, 142 (1990). *See also Kofoid v.
Woodard Hotels, Inc.*, 78 Or. App. 283, 287-88 (1986)("A discharge
because of sex is not within any of the pursuance of rights or
obligations exceptions to the rule of at will discharge, and it

is clear that the Supreme Court has not yet recognized common law actions for wrongful discharge other than those exceptions. . . . In all other cases, the statutory action is the only remedy, in addition to the administrative complaint procedure available through the Bureau of Labor."). Accordingly, to the extent Plaintiff asserts a claim for wrongful discharge based on the allegation that Defendant terminated him for taking FMLA or OFLA leave, the Court grants Defendant's Motion for Summary Judgment.

**C. Sufficient basis for Plaintiff's wrongful-discharge claim**

To the extent Plaintiff asserts Defendant wrongfully discharged him because Plaintiff resisted Defendant's proposed change to his schedule or engaged in conduct to vindicate his rights under FMLA or OFLA after Defendant allegedly affected his ability to take FMLA leave, the Court concludes Plaintiff has stated a viable claim for wrongful discharge.

Defendant, however, contends Plaintiff cannot establish such a claim for wrongful discharge because his claim is precluded by an adequate statutory remedy and Plaintiff has not shown evidence of a causal connection between any protected activity and Defendant's decision to terminate his employment.

**1. FMLA and OFLA do not preempt Plaintiff's wrongful-discharge claim**

Under Oregon law, wrongful discharge is

"an interstitial tort, designed to fill a remedial
gap where a discharge in violation of public
policy would be left unvindicated." *Dunwoody v.
Handskill Corp.*, 60 P.3d 1135, 1139 (Or. App.
2003). Accordingly, a wrongful discharge claim is
preempted by the availability of statutory
remedies where the legislature has provided (1) a
remedy "adequate to protect both the interests of
society . . . and the interests of employees,"
*Brown v. Transcon Lines*, 588 P.2d 1087, 1095 (Or.
1978), (2) which the legislature intended "to
abrogate or supersede any common law remedy for
damages," *Holien v. Sears, Roebuck and Co.*, 689
P.2d 1292, 1300 (Or. 1984). Where "the statute is
silent with respect to the legislature's intent
. . . in the absence of an explicit statement, the
existence of adequate remedies can be seen
implicitly to establish exclusivity." *Olsen v.
Deschutes County*, 127 P.3d 655, 661 (Or. App.),
*rev. denied*, 136 P.3d 1123 (Or. 2006). "[U]nder
Oregon law, an adequate existing federal remedy
may bar a common law wrongful discharge claim."
*Draper v. Astoria School Dist. No. 1C*, 995 F.
Supp. 1122, 1131 (D.Or.1998).

*Sanders v. City of Newport*, No. 07-CV-776-TC, 2008 WL 2234085, at

*11 (D. Or. May 30, 2008). Courts in this District have held the

statutory remedies under FMLA and OFLA do not preempt a wrongful-

discharge claim under Oregon law because they do not authorize an

award of "'general' or 'non-economic' damages for emotional

distress, in which a jury attempts to place a monetary value upon

intangibles such as the plaintiff's pain, suffering, humiliation,

aggravation, or loss or dignity." *See Sanders*, 2008 WL 2234085

at *12 (quoting *Metro. Transp. Dist. of Or.*, No. CV 04-296-PA,

2006 WL 1371656, at *1 (D. Or., May 15, 2006)). *See also Edwards*

*v. Marquis Cos. I, Inc.*, No. 08-CV-390-MO, 2009 WL 2424670, at

34 - OPINION AND ORDER

*10 (D. Or. Aug. 6, 2009)(same).  This Court agrees and concludes Plaintiff's claim for wrongful discharge is not preempted by FMLA or OFLA.

      **2.    Analysis**

      Although Plaintiff may contend Defendant wrongfully discharged him for resisting Defendant's proposed change to his schedule that, according to Plaintiff, would have affected his ability to take FMLA leave, Defendant asserts Plaintiff has not shown evidence of any genuine issue of material fact as to a causal connection between any protected activity and Defendant's decision to terminate Plaintiff's employment.  The Court agrees.

      It is undisputed that Plaintiff objected orally and in an email to Larmanger about the proposed changes to his schedule in August 2008.  Although these objections were related to Plaintiff's need to take FMLA leave, Plaintiff also objected on the basis that his days and hours of work were bargained-for issues that Larmanger could not change without meeting with Plaintiff's union representative.  In addition, the record reflects Plaintiff had been taking FMLA leave intermittently for years before Defendant reviewed his use of it, and Defendant's review occurred only after Lizabeth Pacosa complained about Plaintiff's alleged misconduct.  Moreover, as noted, Gardner concluded Plaintiff's FMLA use was not fraudulent.  At that

35 - OPINION AND ORDER

point, Defendant dropped its review and any discussion of Plaintiff's use of FMLA leave.  Finally, the record reflects Sherlock, who did not have any prior knowledge of Plaintiff or his scheduling issues, concluded Plaintiff had violated numerous privacy policies of Defendant, his violations were frequent and grossly negligent at the least, and his access to the medical records of his wife and daughter formed separate bases for Plaintiff's termination.

On this record, the Court concludes Plaintiff has not shown there is any genuine issue of material fact as to a causal connection between any protected activity and Defendant's decision to terminate Plaintiff's employment.  Accordingly, the Court grants Defendant's Motion for Summary Judgment as to Plaintiff's Seventh Claim for wrongful discharge.

## CONCLUSION

For these reasons, the Court **GRANTS** Defendant's Motion (#14) for Summary Judgment and, accordingly, **DISMISSES** this action **with**

**prejudice.**

IT IS SO ORDERED.

DATED this 20th day of January, 2011.

/s/ Anna J. Brown

_____
ANNA J. BROWN
United States District Judge

37 - OPINION AND ORDER